No. 13,312.

FISCHER LAND AND IMPROVEMENT CO. VS. LANDRY L. BORDELON, PRESI-

DENT, POLICE JURY.

SYLLABUS.

A parish is an involuntary corporation vested with a portion of the political powers of the State, and exercises only a legislative authority. It is not liable in damages for torts or trespass committed upon the property of individual citizens to whom it sustains no private relations. In this respect, the parochial differs essentially from the municipal corporation.

APPEAL from the Tenth Judicial District, Parish of Avoyelles. *Lafargue, J.*

Fischer Land & Improvement Co. vs. President Police Jury.

*Saunders & Gurley* and *Joseph Clifton Cappel* for Plaintiff, Appellant.

*Charles V. Porter,* District Attorney, (*Joffrion & Joffrion* of Counsel) for Defendant, Appellee.

The opinion of the court was delivered by

WATKINS, J. The plaintiff seeks to recover from the Parish of Avoyelles, in its corporate capacity, the sum of seventy-five thousand dollars damages, for this, to-wit:.

That it is the owner of several thousand acres of swamp land situated in said parish, which is heavily timbered with cypress and other valuable timber. That a contract was made with the Police Jury of said parish, represented by a formal resolution, whereby its transferer, Conrad B. Fischer, was granted the right to construct a dam or lock on what is known as the Old Canal, connecting Turner's Bayou with Bayou Jack; and in compliance with the provision of said resolution, Fischer furnished bond with good and solvent security in the sum of five thousand dollars, to cover any damages that might be sustained by any property owners in the vicinity of said lands from overflow or other causes attributable to the construction or operation of said dam.

That in consideration of said privilege, Fischer purchased and entered about thirty thousand acres of swamp land, with the view of manufacturing the timber thereon into lumber.

That in pursuance of said contract, Fischer constructed a dam or lock in said canal, in accordance with said resolution; and in order to successfully operate the same, built protecting wings or levees at great expense and extended them out from said locks in sufficient height and length to enable him to float and market the saw-logs cut from said timber, and that same were absolutely necessary for that purpose.

That as the water held by petitioner's dams and levees began to accumulate on petitioner's lands, sundry persons of the defendant parish, most of them residing on Bayou Jack, did during such time on divers and frequent occasions, openly threaten to destroy petitioner's property, levees and dams, and did threaten petitioner's workmen, who were engaged in working on said timber, and by intimidation and assault did drive many of them from their work; that said residents, on divers and frequent occasions, held open and public mass meetings,

threatening the cutting and destruction of petitioner's property and to bodily harm the petitioner's workmen.

That all of said facts and acts were made known to the Police Jury of the defendant parish, and that instead of trying to prevent such mob violence, such officers openly encouraged said citizens to commit said acts of destruction and waste.

That, notwithstanding petitioner made frequent demands of the president of the Police Jury of the defendant parish, as well as the sheriff of same, to protect its property, calling attention to the threats which had been made, and offering to advance the necessary money to guard their said property, said officers disregarded all such appeals, and encouraged said mob violence; and that said Police Jury at the most critical period of time, and· in the very heat of such open threats, repealed the original resolution granting the right to build said locks and dams, and without any notice to petitioner.

That on or about the 16th of April, 1897, petitioner's said locks were cut and destroyed by the mob, composed of about seventy-five citizens from the aforesaid portion of said defendant parish—the names of several of them being enumerated, and the statement is then made that others of the party were unknown.

That the aforesaid willful destruction of their property, by such mob violence, was but the execution of previous threats, and same could not be prevented by petitioner, and was encouraged by the unwarranted action of the Police Jury in attempting to repeal the aforesaid resolution.

That having been apprised of these threats, they did all in their power to pacify the mob, offering to pay any damages shown, without resort to litigation; that these offers were repeatedly made to citizens directly and through the Police Jury.

That it was the duty and obligation of the lawful authorities of the parish of Avoyelles to protect petitioner's property and workmen, and that they could have easily done so; that they failed in their duty and that such failure caused the damages hereinbefore and hereinafter complained of; and that said parish is liable therefor.

Thereupon, plaintiff's petition circumstantially recites the various particulars of the damages it alleges it sustained, and aggregating the sum mentioned.

The petition concludes with the following averment, to-wit:

"That said parish of Avoyelles is directly responsible for all loss and

432      SUPREME COURT OF LOUISIANA.

Fischer Land & Improvement Co. vs. President Police Jury.

"damages occasioned by the unlawful and violent destruction of pe-
"titioner's property by the mob of citizens as above set forth, and is,
"therefore, indebted unto petitioner in the amount claimed."

Without answering to the merits, the defendant tendered a plea of
no cause of action; and said exception having been sustained and suit
dismissed, the plaintiff prosecutes the present appeal from a judgment
of dismissal.

In the argument of plaintiff's counsel at the submission of the
cause, and in their brief as well, the statement is made that this suit
is instituted under Section 2453 of the Revised Statutes, which pro-
vides:

"The different municipal corporations in this State shall be liable
"for the damages done to property by mobs or riotous assemblages in
"their respective limits."

And, thereupon, the further statement is made that the defendant's
exception "proceeds upon the theory that this section applies to cities
and towns only, and that the words 'municipal corporations' do not
embrace parishes."

The argument on the part of the defendant is, that a parochial cor-
poration is not liable in damages because of the wrongful perform-
ance, by its officers, of such duties as pertain to the police or public
powers of the State, or for the negligent failure of its officers to per-
form such duties, in the absence of a statute creating liability.

That there is a marked distinction between the powers and duties
and the resultant liability of municipal corporations, proper, such as
chartered cities, towns and villages, and *quasi* or involuntary corpora-
tions, such as counties, parishes, etc.

That Section 2453 of the Revised Statutes does not apply to, or in-
clude parochial corporations; that in the sense of that statute a pa-
rochial corporation is not a municipal corporation.

That the legislation of the State as well as the jurisprudence of this
court, have always preserved a distinction between municipal and
parochial corporations; that consequently, the parish of Avoyelles is
not liable to the plaintiff for the causes assigned.

Presumably, it was upon this ground that the district judge sus-
tained the defendant's exception of no cause of action and dismissed
its suit.

Consequently, the limit of our decision must be restricted to the
definition of that term; that is to say, whether the term "municipal

corporations" is to be restricted to cities and towns only, or so construed as to embrace parishes.

This court had under consideration a question of damages *ex delicto* against a municipality, in the case of City of New Orleans vs. Kerr, 50th Ann., 413; and we there decided that the powers and obligations of municipal corporations like the city of New Orleans, are two fold in character: those that are of a public nature, and those of a private nature—citing various decisions of this court.

We further held that in respect "to the first or public character of its powers and obligations, the municipal corporation represents the State—discharging duties incumbent on the State. As to the second, or private character of its powers and obligations, the municipal corporations represents the pecuniary and proprietary interests of individuals. As to the first, where a municipal corporation acts as the agent of the State, it becomes a representative of the sovereignty, and is not answerable for the nonfeasance or malfeasance of its public agents.

"As to the second, the rules which govern the responsibility of individuals are properly applicable"—citing various authorities.

It is the duties and obligations of the second character which plaintiff, in this case, seeks to enforce against the parochial corporation of Avoyelles—treating it as a municipal corporation, and demanding damages arising from the alleged *tort.*

But, the insistence of counsel for the defendant is, that a parish is not a municipal corporation *per se,* but is only a political division of the State, and, as such, is but the agent of the State, and the representative, in part, of its sovereignty, and is not, therefore, answerable in damages to the plaintiff; and that no liability attaches to the defendant on account of the alleged acts of nonfeasance of her officers.

In other words, that a parish possesses and exercises no powers of a private character, such as those incident to a municipal corporation, and, therefore, does not represent the pecuniary and proprietary interests of the individual citizens of the parish.

This court recently had, also, under consideration a case in damages *ex delicto,* against a parochial corporation, in Sherman vs. Parish of Vermillion, 51st Ann., 880—the case being that of a party serving on a jury in a criminal case, and receiving injuries while in the care of the sheriff from which he died, and the charge being that the sheriff "was culpably negligent in giving their son and other mem-

bers of the jury directions to go to a given spot in the dark, which instead of being as it should have been, a safe place, was a pit in which he fell and fatally injured himself."

In that case a plea of no cause of action was tendered, and sustained, and plaintiff's suit dismissed; and in the course of our opinion, we said:

"Police Juries have authority of administration of parish affairs, and have nothing to do with the trial of criminal cases. They, under delegated powers, expressed or implied, represent the parish.

\*            \*            \*            \*            \*            \*

"So, as far as we have been able to examine, all the well considered decisions hold, that political divisions of the State are not responsible for damages in cases such as the one before us for decision. The decisions generally hold that in such cases, the political divisions of the State represent the sovereign, and, therefore, are not responsible in damages.

"These decisions apply, we think, in our State as they do where the town and county system prevails.

\*            \*            \*            \*            \*            \*

"In the light of judicial decisions, the parish is not liable in an action by a party injured because of the negligence of an officer to perform a corporate duty in a criminal case, unless such action is given by statute. Cooley on Constitutional Limitations, p. 246."

Again we said:

"If the parish were held responsible, they alone would have to pay the damages. We have not found any law under which they may be held for said damages. They, the local authorities, the Police Jury, are vested with such powers and prerogatives as are necessary to make rules for the government of their affairs.

"The citizens can not be held responsible for the agents of the State, when acting for the State, in maintaining local government."

The opinion then quotes with favor the following paragraph from Cooley's Constitutional Limitations, to-wit:

"On the other hand, it is settled, that those corporations are not liable to a private action at the suit of a party injured by a neglect of its officers to perform a corporate duty, unless such action is given by statute." p. 246.

Thereupon our opinion says:

"The weight of judicial decisions, we think, and all the commentators upon the subject, sustain this view."

Entertaining this view, this court affirmed the judgment appealed from.

We might rest our decision of the present case upon the authority of those two decisions, but for the fact that counsel for the plaintiff insists that the law has provided a remedy to meet the exigencies of the situation; and they cite the provisions of the Revised Statutes above referred to, to the effect that "the different municipal corporations in this State shall be liable for the damages done to property by mobs or riotous assemblages, in their respective limits"—insisting that a parish comes within the reasonable intendment of the term "municipal corporations".

To that effect he has cited several decisions of this court in which the terms parish and municipal corporations have been used convertibly.

They are the following:

King vs. Police Jury of St. Landry Parish, 12th Ann., 859; Parker vs. Scorgin, 12 Ann., 61; Police Jury of Ouachita vs. Bray, 3rd Rob., 197; Chaudet vs. John, 16 Ann., 400; Lisso vs. Parish of Red River, 29 Ann., 590; Drez vs. Parish of East Baton Rouge, 36 Ann., 307.

*Per contra* defendant's counsel have cited a number of decisions of exactly contrary import, and among the number are the following:

Stewart vs. New Orleans, 9 Ann., 461; Lewis vs. City of New Orleans, 12 Ann., 190; Bennett vs. New Orleans, 14 Ann., 120; King vs. Police Jury of St. Landry, 12 Ann., 856; Howe vs. New Orleans, 12 Ann., 481; City of New Orleans vs. Kerr, 50 Ann., 413; Sherman vs. Parish of Vermillion, 51 Ann., 880; Railroad Company vs. City of New Orleans, 26 Ann., 491; City of New Orleans vs. Abagnatto, 26 L. R. A., 392, 62 Fed. Rep., 240.

An examination of these decisions referred to, disclose that there are chance or accidental expressions contained in some of them which would indicate the correctness of the plaintiff's view; but we do not regard any of them as being at all authoritative on the question.

The topic in the Revised Statutes wherein the provision relied upon is found is "Municipal Corporations"; but there are other sections than the one referred to, which lead to an opposite interpretation.

But no where is the distinction between parishes and municipal corporations more clearly defined than in the present Constitution of the State.

Article 229 declares that "no political corporation shall impose a greater license than is imposed by the General Assembly for State purposes. * * * The General Assembly shall have authority to provide that municipalities levying license taxes, equal in amount to those levied by Police Juries for parochial purposes, shall be exempt from the payment of such parochial licenses."

Article 230 provides that "there shall also be exempt from parochial and municipal taxation for a period of ten years from the 1st of January, 1900, etc."

It further provides "that when aid has heretofore been voted by any parish, ward, or municipality, to any railroad, etc."

Article 232 provides that "the State tax on property for all purposes whatsoever * * * shall not exceed in one year * * * and no parish, municipality or public board tax for all purposes whatsoever, shall exceed in any one year ten mills on the dollar of valuation."

Article 277 provides that "the General Assembly may establish and organize new parishes, which shall be bodies corporate, with such powers as may be prescribed by law, but no new parish shall contain less than 625 square miles, nor less than 7000 inhabitants; nor shall any parish be reduced below that area or number of inhabitants."

Article 281 provides "municipal corporations, parishes, and drainage districts, the city of New Orleans excepted, when authorized to do so by a vote of the majority in number and amount of the property tax-payers, etc."

The clear distinction taken by these constitutional provisions between municipal corporations and parishes, can leave no doubt upon our minds as to the proper conclusion in regard to the issue before the court; but the adjudications on the question are equally clear.

In Mayer vs. Ray, 19 Wall., 475, the Supreme Court said:

"A municipal corporation is a subordinate branch of the domestic government of a State."

In East Tennessee University vs. Knoxville, 6 Baxter, 166, it was held by the Tennessee court that a municipal corporation is a body corporate established by law to share in the *civil* government of the

county, but chiefly to regulate the *local* internal affairs of a city, town or district incorporated."

Judge Dillon defines a municipal corporation to be "the incorporation by the authority of government, of the inhabitants of a particular *place,* or district, and authorizing them in their corporate capacities to exercise *subordinate and specified* powers of legislation with respect to their local government, which is the distinctive and distinguishing feature of a municipal corporation, proper." 1 Dillon's Mun. Corp., Sec. 20.

The parish or county is denominated in the books and known in the law and in the decisions, as a *quasi or involuntary* corporation, as distinguished from a municipal or *voluntary* corporation, possessing some corporate functions and attributes; but they are, primarily, political subdivisions of a State, merely.

The substance of the decisions on this subject is thus summarized in the American and English Encyclopœdia of Law:

"Involuntary, *quasi* corporations, such as counties, towns, etc., are created almost exclusively with a view to the policy of the State at large, for purposes of political organization and in matters of finance, of education, of provision for the poor, of military organization, of the means of travel and transportation, etc. They are not bodies corporate and politic within the general power of corporations; but are mere political subdivisions of the State, having the powers expressly granted to them, etc." Volume 15, page 955.

To this effect are the following authorities:

Beach vs. Leahy, 11 Kan., 23; Hamilton vs. Mighels, 7 Ohio St., 109; Harris vs. School District, 28 N. H., 58; Mower vs. Inhabitants of Leicester, 9 Mass., 247; Morey vs. Town of Newfame, 8 Barber, 645; Talbot County vs. Queen Ann County, 50 Md., 245; Ward vs. Hartford County, 12 Conn., 404; Sopper vs. Henry County, 26 Iowa, 264; Freeholders vs. Strader, 18 N. J. (Law), 108.

One of the most accurate definitions of a county is given by the Ohio court in the decision cited *supra,* to-wit:

"A local subdivision created by the sovereign power of the State of its own will, without the particular solicitation or consent, or concurrent action of the people who inhabit it."

The foregoing is in keeping with all the authorities on the question; and is equally well attested by the history and organization of this State.

On October 1, 1800, Spain ceded to France the colony or province of Louisiana, with the same extent that it then had in the hands of Spain, and that it had when France possessed it; and the French Republic ceded to the United States the same territory on April 13, 1803. By an Act of Congress of the 30th of March, 1805, a portion of the ceded province was given a territorial form of government under the name of the Territory of Orleans, and the people of the territory adopted a constitution and State government, and same was admitted into the Union on the 8th of April, 1812. That constitution provided that representation, in the legislative department of the government, should be apportioned "to the several *counties* entitled to representation"; and the State was divided into fourteen senatorial districts. Section 10.

That section provides that "the parishes of St. Bernard, and Plaquemine, including the country above * * * shall form one district." "The *City* of New Orleans"—giving its boundaries—"shall form the second district; the remainder of the *county of Orleans,* shall form the third district. The *counties* of German Coast, Acadia, Lafourche, Iberville, Pointe Coupee, Concordia, Attakapas, Opelousas, Rapides, Natchitoches and Ouachita shall each form one district, and each district shall elect a senator."

That constitution was signed by delegates as representing the *county* of Orleans, and the other *counties* enumerated.

But the Constitution of 1845 provided, that "each *parish* shall have, at least, one representative" (Article 18); and the various *parishes* were enumerated. Originally, the division of the territory into counties, was evidently made by the territorial legislature; and the designation of the subdivisions of the State as parishes, was the result of State legislation—and amongst the number was the *parish of Orleans.* To the latter was given a legislative representation of twenty-five; while the territory embracing same was divided by the Mississippi river, and to each portion was given one senator each—*the city of New Orleans* being entirely omitted.

That situation has continued until the present time.

This statement shows the manner in which Louisiana was evolved from a province into a territory, and from a territory into a State; and the manner in which the subdivisions of the province and territory, styled counties, became the parishes of the State, and how the

*city of New Orleans* ceased to enjoy legislative representation, and the *parish of Orleans* was substituted in its place.

This process of evolution in Louisiana is an illustration of the development of other States of the Union, as well as the development of the States and governments of the Ancients—the city coming first and the State afterwards, and then the parish.

The city first created the State, and the State created the county and parish. The city of New Orleans first attracted conspicuous attention to the Louisiana province, and, doubtless, superinduced emigration from France, whereby it was chiefly populated.

The student of ancient history as connected with the study of political institutions has developed the fact, that the village-community is the unit of organization in the city and the State. Freeman's Comparative Politics.

In the course of a lecture of recent date, before the Louisiana Bar Association, on the "Comparative Study of Roman and English Law", by Honorable Hannis Taylor, the idea of the village-community being the unit of organization of the city first, and afterwards the State, is most accurately portrayed; and the relation of the city to the State aptly and forcibly conveyed, as will be shown by the following extract therefrom:

"The most valuable single result so far attained by the application " of the comparative method to the study of political institutions is " embodied in the discovery that the unit of organization in all the " Aryan nations, from Ireland to Hindoostan, was the naturally organ- " ized association of kindred—the family swelled into a clan—which, " in a settled state, assumed the form of a village-community. When " we have firmly taken hold of that fact; when we clearly understand " that the original unit of organization was the same in all the Aryan " nations, whether situated on the shores of the Mediterranean or the " Baltic, we have possessed ourselves of the atom or unit which, in " different forms and different combinations, everywhere entered into the structure of the State.

"For the earliest illustration of the ancient conception of the State " as the city-commonwealth, we must go to the Hellenic world in " which the science of politics was born. The dominant political idea " we there encounter is embodied in the independent city which stands " toward all other cities as a sovereign commonwealth whose internal " affairs are regulated by its own domestic constitution. When the in-

" ternal organization of such a city is examined, the fact is revealed
" that the city commonwealth is a composite whole, which has arisen
" out of the aggregation of village communities. In this system of
" cities, internally organized, after one general model, were contained
" the political conditions with which Aristotle, the acknowledged
" founder of political science, was brought into contact, and from the
" first book of politics we learn that the State differs from the house-
" hold only as to the number of its members, a fact which will appear
" from an examination of its elements.

"Out of the very necessities of social existence, arise the relations
" of husband and wife, parent and child, master and servant; and thus
" the household is formed.

"Out of a union of households arises the village or tribe; out of a
" union of villages or tribes arises a community of a higher order—
" the State—which is the natural and necessary completion of the
" process of aggregation in which the family is the unit or starting
" point. Neither the family nor the tribe is, in itself, sufficient for
" all the wants of social existence; it is only in a union of tribes—the
" State—that man finds the one form of life that will fully develop all
" of his capabilities."

Again:

"When we pass from the Greek to the Italian peninsula, we find the
" idea of the independent city to be the leading political idea, and we
" also find the Italian city to be the resultant of the process of ag-
" gregation heretofore described, in which the village-community, or
" clan is the unit or starting point. The idea of the State as an in-
" dependent city was never carried out, however, with the same com-
" pleteness in Italy as in Greece, for the reason that the Italian cities,
" which were generally smaller than those of Greece, manifested a
" greater willingness to join together in confederations.

"In that way, the history of ancient Italy is far more a history of
" confederation than of single cities. And yet it was upon the soil of
" Italy that a group of village-communities grew into a single inde-
" pendent city that centralized within its walls the political power of
" the world. The way in which Rome accomplished that marvelous
" result, was by departing from the exclusive policy of the Greek
" cities, and by extending the right of Roman citizenship alike to her
" conquered enemies and to her faithful allies. The franchise of the

" Roman city was first extended to Italy, then to Gaul and Spain, and " finally to the whole Roman world.

"In the end· a right so widely bestowed became, of course, utterly " worthless; but the theory upon which the right was conferred was " never, for a moment, lost sight of. The freemen who received the " franchise of the Roman city could only enjoy it within her own " walls; it was only within the local limits of the ruling city that the " supreme powers of the state could be exercised.

"So, whether we take for illustration the exclusively Greek city, or " the great Latin city extending its franchise to all the world, the an-" cient conception of the State as the city-commonwealth stands forth " clearly and distinctly defined."

From the foregoing liberal quotations from that celebrated writer, the distinction between the city and the State, as they originally existed in Greece and Italy, may be clearly perceived.

A careful consideration and study of the question, in connection with the authorities cited, has led us to the conclusion that the statute relied upon by plaintiff's counsel is without application to parishes; but is to be restricted to municipal corporations, as its terms plainly imply.

That, while it is true that municipal corporations, are, under the present Constitution creatures of legislative enactment, as well as parishes, their functions and powers are different.

The parish being a purely political and *involuntary* corporation, and vested with a portion of the political power and authority of the State, does not deal with individual citizens ·in a personal capacity;. while the town or city is primarily a civil or *voluntary* corporation, not necessarily possessing any share in the political power of the State.

Statutes creating Police Juries, or boards for the government of the parishes, confer upon them only a *quasi*-legislative authority, and the right to govern and control such matters as roads, bridges, ferries, and the like; but they provide them with no means or power of enforcing their ordinances. They are created and organized under general laws which operate equally in every parish of the State—the parish of Orleans excepted.

On the contrary the various municipalities in the State are strictly local in character, and in their operation; and no two of them are, of necessity, alike in the powers which they possess, the mode of their exercise, or the objects to be attained.

Hence it is that the town and city may precede the State into which they become incorporated; but the parish must, of necessity, await the formation of the State.

For the considerations and reasons herein assigned, we are clearly of opinion that the plaintiff has no right of action against the parish of Avoyelles.

Judgment affirmed.